IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

DONALD REYNOLDS,

      Plaintiff,

v.                                  Case No. 5:20-cv-00753

FEDERAL BUREAU OF PRISONS,
D.L. YOUNG Warden, in his official capacity;
MANNING, SIS Officer, in his official capacity;
SWEENEY, SIS Officer, in his official capacity;
WISEMAN, BANTON, and ANSLEY, in their
official capacities,

      Defendants.

**PROPOSED FINDINGS AND RECOMMENDATIONS**

In November 2020, Plaintiff Donald Reynolds ("Reynolds") initiated this civil action seeking declaratory and injunctive relief related to alleged violations of his constitutional rights to send and receive mail and to be free from retaliation. (ECF No. 2). Reynolds's pleading was construed as a complaint under *Bivens v. Six Unknown Federal Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), was assigned to the Honorable Frank W. Volk, United States District Judge, and was ultimately referred to the undersigned United States Magistrate Judge by Standing Order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Currently pending before the Court are competing Motions for Summary Judgment filed by Defendants and Reynolds. (ECF Nos. 246, 261). Having fully considered the motions, and for the reasons that follow, the undersigned respectfully **RECOMMENDS** that Defendants' Motion for Summary Judgment be **GRANTED**;

Plaintiff's Motion for Summary Judgment be **DENIED**; and this case be **DISMISSED** and **REMOVED** from the docket of the Court.

## I.    <u>Relevant History</u>

In 2007, Reynolds was convicted of armed bank robbery, discharging a firearm during a crime of violence, and possession of a firearm by a convicted felon. *United States v. Reynolds,* Case No. 1:06-cr-00081 (S.D. Ga. Mar. 7, 2007). On July 31, 2007, he was sentenced to a lengthy prison term. While incarcerated, Reynolds has published multiple manuscripts through his publishing company, Uncaged Minds Publishing ("Uncaged Minds").

In January 2020, Reynolds was transferred to Federal Correctional Institution ("FCI") Beckley, where he is currently incarcerated. Reynolds claims that in May 2020, he attempted to mail three completed manuscripts to Uncaged Minds by certified mail, but the manuscripts were destroyed or withheld by FCI Beckley mailroom employees, Defendants Manning and Sweeney. (ECF No. 12 at 4). Reynolds filed an administrative remedy over the loss of his manuscripts and was assured by the mailroom supervisor that the staff's improper behavior would never happen again. (*Id.*).

Notwithstanding this assurance, Reynolds claims that in October 2020, mailroom staff failed to provide him with several pieces of certified mail. (*Id.* at 5). Reynolds states that he submitted an administrative remedy over the missing mail, which triggered an onslaught of retaliation by FCI Beckley employees. Reynolds asserts that shortly after filing the administrative remedy, he was called to the mailroom, threatened by mailroom staff, called an expletive, and told that if he continued filing grievances, he would not receive his mail. (ECF No. 12 at 5). The next day or so, Reynolds filed a "sensitive" administrative remedy with the Office of the Inspector General, citing the threat of

retaliation against him. (ECF No. 12 at 6). This form was rejected for various errors; including, that its contents were not sensitive, and that it was filed at the wrong level and directed to the wrong office. (ECF No. 16 at 14).

In contrast to Reynolds's recollection, the record before the Court shows that, in total, Reynolds filed only two administrative remedy forms related to his mail handling: one on June 2, 2020 at the institutional level and the "sensitive" one on or about October 9, 2020 to the Central Office. (ECF No. 2 at 8; ECF No. 12 at 6; ECF No. 34-1 at 50). The first remedy was exhausted when it was informally resolved; however, that remedy only pertained to the alleged loss of three pieces of certified mail in May 2020. There is no evidence that Reynolds filed additional grievances about any other lost or rejected mail or manuscripts, and he did not refile or pursue an administrative remedy concerning the subject matter of the sensitive grievance through all of the steps of the Federal Bureau of Prisons' ("BOP") administrative remedy procedure. (ECF No. 34-1 at 50).

Reynolds claims that since then, he has had a substantial amount of his mail rejected by mailroom staff, as well as by Special Investigative Services ("SIS") officers, for reasons that are unjustified. (ECF No. 12 at 6). As an example, Reynolds indicates that a manuscript he prepared for mailing was returned to him as "rejected" on November 3, 2020 "per Warden/SIS." (ECF No. 12 at 6). Reynolds contends that he has now been told he will no longer be able to mail out manuscripts.

On November 4, 2020, Reynolds initiated this action by mailing a complaint to the Court, asking for declaratory and injunctive relief. (ECF No. 2). In the complaint, Reynolds claimed that the rejection of his manuscripts for mailing was not done out of any legitimate penological interest, but rather, was in retaliation for his filing of grievances. (*Id.* at 4). Reynolds further alleged that he published novels while

3

incarcerated at FCI Beckley, and it was only after he submitted grievances that the mailroom staff began to reject his manuscripts. (ECF No. 2 at 4). Reynolds claimed to have suffered concrete, particularized, actual, and imminent injury to a legally protected interest.

On November 24, 2020, Reynolds submitted an amended complaint, adding additional defendants and expounding on his claims. (ECF No. 12). In the amended pleading, Reynolds alleges that Defendants Sweeney and Manning illegally destroyed three of his manuscripts. (*Id.* at 7). He claims that Defendants Young, Sweeney, and Manning are denying him freedom of expression by prohibiting him from sending his manuscripts to Uncaged Minds for publication. Reynolds identifies Defendant Wiseman as the mailroom staff member who threatened him with retaliation for filing grievances and adds that Wiseman has made the administrative grievance process "unavailable" to him for fear of further retaliation. (*Id.* at 7–8). Reynolds additionally alleges that Defendants Banton and Ansley have taunted him by sending numerous notifications of rejected "incoming" mail, which Reynolds claims is in retaliation for his filing of the sensitive grievance. (*Id.* at 8). Reynolds asks for injunctive relief and money damages. (*Id.* at 9).

In September 2021, the undersigned considered dispositive motions filed by the parties. (ECF No. 97). Defendants argued that Reynolds had failed to exhaust his administrative remedies; that his claims were not cognizable under *Bivens*; that he had failed to state a constitutional claim because the disputed mail was properly rejected under BOP policy prohibiting inmates from operating a business; and that Defendants were entitled to qualified immunity. (*Id.* at 4). In his competing motion, Reynolds argued that there were material factual disputes that precluded summary judgment; particularly,

as the parties had not yet conducted discovery. (ECF No. 97 at 4). He reiterated that Defendants were retaliating against him for filing grievances and contended that Defendants had manufactured the claim that he was operating a business. (*Id.* at 5).

The undersigned concluded that Reynolds's claim of First Amendment retaliation was not recognized under *Bivens*, but Reynolds had stated a plausible claim that his First Amendment right to send and receive mail was being violated by Defendants; consequently, Reynolds should be permitted to conduct discovery on that issue. (*Id.* at 8). The undersigned recommended that Reynolds's claim for money damages be dismissed, but that his claim for injunctive relief remain pending until discovery could be completed. (*Id.* at 10–13). In addition, discovery on the exhaustion issue was merited given Reynolds's claim that the administrative remedy process was unavailable to him. (*Id.* at 13). The parties began discovery on September 30, 2021, and the presiding District Judge adopted the aforementioned recommendations. (ECF Nos. 96, 176). As part of the discovery process, the undersigned reviewed *in camera* all of the mail addressed to Reynolds that was rejected by FCI Beckley staff between April 18, 2020 and June 29, 2021. (ECF No. 207). On April 13, 2022, the undersigned issued an Order detailing the results of the *in camera* review, finding that eleven pieces of incoming mail addressed to Reynolds were rejected over the fourteen-month period without a clear reason for their rejection. (ECF No. 235). Another 56 pieces of mail were rejected pursuant to a policy of the BOP or FCI Beckley. (*Id.* at 2–9).

## II.   **Pending Motions for Summary Judgment**

### A. *Defendants' Motion*

On May 13, 2022, Defendants filed a Motion for Summary Judgment and supporting memorandum. (ECF Nos. 246, 247). Defendants note that two issues remain

in the case: (1) whether Reynolds exhausted administrative remedies; and (2) whether Reynolds's mail is being improperly rejected, meriting prospective injunctive relief. (ECF No. 246 at 1). Defendants argue that certain pieces of Reynolds's mail have been, and continue to be, properly rejected when they violate BOP policies governing inmate mail. In particular, Defendants claim that Reynolds has repeatedly violated a regulation which prohibits inmates from operating a business. In addition, Defendants argue that the amended complaint should be dismissed because Reynolds has entirely failed to exhaust administrative remedies. (ECF No. 246 at 2). In support of their position, Defendants attach various exhibits to the Motion, including the following:

1. A Declaration of SIS Lieutenant Michael Austin. (ECF No. 246-1 at 1–5). Austin explains that inmate mail is governed by BOP Program Statement 5265.14, entitled "Correspondence." In addition, FCI Beckley has established an Institutional Supplement outlining local rules and procedures in relation to inmate correspondence. Austin explains that beginning in March 2020, FCI Beckley participated in a pilot program using a third party contractor to manage general inmate correspondence. (ECF No. 246-1 at 1–5). Mail was received by the third party contractor, scanned, and forwarded to FCI Beckley in PDF format for review by FCI Beckley mailroom staff. If the mail violated policy, it was rejected and a notice was sent to the inmate and the sender. (ECF No. 246-1 at 3). If the mail was acceptable, it was printed and distributed to the inmate. (*Id.*). FCI Beckley did not receive or hold any original correspondence. However, the third party contractor maintained the originals for 45 days to give inmates an opportunity to file an administrative remedy in case there were issues with the mail, such as poor scan quality, missing pages, or other concerns. The third party contractor offered a free service to inmates' families, called MailGuardTracker.com, which allowed families to view delivery

status of mail, receive notifications of rejected mail, and download copies of mail that was received and processed. Specifically as to Reynolds, Austin indicated that mailroom staff determined that Reynolds was participating in a publishing business called Uncaged Minds. To ensure that their determination was correct, in June 2020, mailroom staff consulted with SIS staff, including Sweeney and Manning. After conducting an investigation of Uncaged Minds, SIS staff concluded that Reynolds was operating the business in violation of BOP policy prohibiting inmates from conducting unauthorized business activities through mail, telephone, and email. Once this conclusion was reached, staff began rejecting mail related to Reynolds's business. Austin explains that if any part of a piece of correspondence violates BOP policy, the entire mailing is rejected. (ECF No. 246-1 at 4).

2.  Reynolds's inmate history demonstrating that he was incarcerated on August 8, 2007 and arrived at FCI Beckley on January 16, 2020. (ECF No. 246-1 at 7).

3.  BOP Program Statement 5265.14. (ECF No. 246-1 at 9–33).

4.  FCI Beckley Institution Supplement No. BEC-5800.16d—Mail Management Manual. (ECF No. 246-1 at 35–40).

5.  The OIA Investigative Report of Reynolds's allegation that he was threatened by Wiseman for filing grievances. (ECF No. 246-2). The investigative report indicates that the facility learned of Reynolds's allegation through the instant action. It states that Reynolds claimed three of his manuscripts were lost or destroyed by the mailroom. He asserted that he did not make money on the books; instead, his wife received the money. (*Id.* at 3). Reynolds indicated that in October 2020 he was called to the mailroom to speak with Banton. While there, Wiseman cursed at him, told him not to file any more grievances, or Wiseman would come to his cell and mess him up. (*Id.*). Reynolds conceded

7

that he knew he was not supposed to conduct a business or publish under a byline while in custody but believed there was a law that overrode the BOP byline policy. With respect to the missing manuscripts, the report states that Banton checked the logs for tracking numbers, as the manuscripts were sent by certified mail, but he found no evidence that the manuscripts were logged, and USPS had no tracking numbers for them. (ECF No. 246-2 at 4). Ultimately, the investigator could not find sufficient evidence to support Reynolds's allegations. (*Id.* at 6).

6. A Declaration of Doug Wiseman, a correctional officer at FCI Beckley and a defendant in this case. (ECF No. 246-3 at 2–3). Wiseman recalled speaking with Reynolds in October 2020, but denies threatening him or instructing him not to file administrative remedy forms. Wiseman confirms that Reynolds was conducting an unauthorized business in violation of BOP policy, stating that he and members of other departments at FCI Beckley reached this opinion based upon their review of Reynolds's mail, email, telephone communications, external social media, and websites. Wiseman indicated that he had no involvement in managing the administrative remedy program or reviewing remedy forms that were filed by inmates. (*Id.* at 3).

7. Various email communications between Reynolds and others concerning business operations. (ECF No. 246-3 at 7–31). The emails discuss a cash app, which Reynolds instructs others to check for him; authors; contracts; edits that Reynolds is making on the books of other authors; video analytics of views regarding books Reynolds authored; royalties earned on books written by Reynolds that were being sold by Amazon; cover designs; instructions to others on what to ask bankers regarding Reynolds's accounts; Reynolds contracting with a research service; information collected by Reynolds on advertising rates; logos and other designs; instructions related to his

8

webpage; instructions on handling the cash app; instructions to his wife on managing the business; his need for an assistant; hiring an assistant; information to Reynolds about other authors publishing through his company; statements about Uncaged Minds' services; and advertisements selling Reynolds's novels. (ECF No. 246-2 at 7-31).

In the supporting memorandum, Defendants acknowledge that inmates are permitted to prepare manuscripts for private use or publication without staff approval and can mail them as general correspondence. (ECF No. 247 at 2) (citing 28 C.F.R. §§ 551.81, 551.82). However, this permission is not without limitation, as the Warden at each institution is directed to establish controls to protect individuals, as well as the security, discipline, and good order of the institution. Correspondence may be rejected by the Warden if it relates to the direction of an inmate's business. (*Id.* at 3) (citing 28 C.F.R. § 540.14).

Defendants assert that mailroom staff at FCI Beckley review all general correspondence sent to inmates. If the mail fails to meet BOP and institutional standards, the mail is rejected, and a rejection notice is sent to the inmate and the sender of the mail. (*Id.* at 4). At some point, mailroom staff at FCI Beckley observed that Reynolds's mail often contained references to "other inmates' writings, editing other inmates' manuscripts; discussions of earnings, actual manuscripts with indications that other inmates had written the manuscripts, and directions to outside parties as to logo designs and other business decisions." (*Id.* at 4–5). Suspecting that Reynolds was operating an unauthorized publishing business, mailroom staff consulted with SIS staff, including Sweeney and Manning. After conducting an investigation, SIS staff concluded that Reynolds was conducting or attempting to conduct an unauthorized business. Accordingly, Reynolds's incoming mail was closely examined, and any mail determined

to relate to Reynolds's impermissible business was rejected. (ECF No. 247 at 5). Defendants point out that the Court reviewed the rejected mail in camera, agreed that all but eleven pieces of mail were properly rejected, and sought further explanation for rejection of the remaining eleven pieces.

Defendants additionally argue that Plaintiff's only support for his claim that administrative remedies were unavailable is the alleged threat by Wiseman. However, Defendants claim that Reynolds's allegation was not substantiated, and he filed a lawsuit and other administrative remedy forms after the alleged threat. (*Id.* at 6). Moreover, Reynolds has not alleged that Wiseman took any action against him, and there is no evidence that Reynolds has suffered any reprisals. (*Id.* at 10–12).

According to Defendants, injunctive relief is not intended to restrain an act that causes only trifling injurious consequences; rather, an injunction should only issue when intervention of the court is "essential in order effectually to protect property rights against injuries otherwise irremediable." (*Id.* at 7) (citations omitted). Defendants contend that, while inmates and senders have a constitutionally protected interest in receiving and sending mail, prisons are permitted to impose restrictions on prisoner correspondence when the restrictions are "reasonably related to legitimate penological interests." (*Id.* at 8) (citation omitted). Defendants argue that prison officials must be afforded "wide-ranging deference" in how they adopt and execute policies designed to preserve internal order and discipline. Defendants assert that Reynolds was clearly violating BOP policies and that he has offered no evidence to the contrary. Accordingly, Defendants acted in conformity with BOP policy in rejecting Reynolds's mail relating to his business. (*Id.* at 9–10).

Reynolds filed objections to the Motion for Summary Judgment. (ECF No. 255). In

large part, Reynolds complains that he did not receive rejection notices for much of the mail that was withheld. He also states that Austin's declaration regarding an investigation by Sweeney and Manning constitutes perjury, because Sweeney and Manning both stated in response to discovery requests that they did not conduct an investigation of Reynolds. (ECF No. 255 at 5–6). Reynolds argues that even though BOP policy prohibits an inmate from conducting an unauthorized business, it includes an exception; that being, that an inmate may take steps to protect property and funds that belonged to the inmate prior to his incarceration. (*Id.* at 7). He claims that his intellectual property is no different than a house, land, stocks, or bonds. Thus, he states, the BOP cannot prohibit him from "enjoying the fruits of his labor—in the form of profits." (*Id.*). In support, Reynolds attaches responses to interrogatories by Manning in which he testifies on multiple occasions that he did not personally investigate Reynolds. (*Id.* at 13–17). Reynolds also filed an affidavit in support of his objections in which he states that he was not given rejection slips for 40–50 pieces of mail over the prior two years and was not given his legal mail from the Court. (ECF No. 258).

### B. Reynolds's Motion

On June 3, 2022, Reynolds filed a Motion for Summary Judgment arguing that Defendants' failure to provide him notices for all of his rejected mail violated his rights under the First and Fourteenth Amendments to the United States Constitution. (ECF No. 261). Reynolds claims that Defendants have also withheld his legal mail in an effort to prevent him from objecting and advancing his case against them. Reynolds claims that he exhausted the administrative remedy process as to the three missing manuscripts, and he was given the green light to go forward with his writing and publishing activities. (*Id.* at 4). Reynolds reiterates that there is an exception to the policy prohibiting inmates from

operating an unauthorized business, which allows him to engage in correspondence necessary to enable him to protect property and funds that were legitimately his at the time of his commitment to the BOP. (ECF No. 261 at 5). Reynolds states that he has been in federal prison for over sixteen years—spending time at two high security prisons and two medium security prisons, including FCI Beckley—and he has never, until now, encountered such "hate, threats, racism and unjustified deprivations of his constitutional rights." (*Id*. at 6). He argues that the BOP encourages inmates to do rehabilitative activities, but then FCI Beckley punishes them for engaging in such activities. (*Id*.).

In response to Reynolds's request for summary judgment in his favor, Defendants argue again that Reynolds has not met the high bar necessary to justify the equitable remedy of injunction. (ECF No. 274). They contend that the evidence before the Court is largely undisputed and clearly shows that Reynolds is operating a business. Defendants agree that the BOP encourages inmates to write and publish, but do not allow inmates to operate a publishing company. (*Id*. at 4). Defendants assert that Reynolds has added new claims to his list of complaints, such as not receiving notice of rejected mail, even though he has not exhausted administrative remedies on them. (*Id*. at 6). Defendants refute Reynolds's allegation that he did not receive notices when his mail was rejected, indicating that providing such notices is the policy, custom, and practice of FCI Beckley, and pointing out that, contrary to his allegation, Reynolds must have received notices given that he attached a number of them to various motions he filed with the Court. (*Id*. at 7).

In support, Defendants attach a declaration of Jason Swager, who is the Trust Fund Supervisor at FCI Beckley. (ECF No. 274-1 at 1). Swager states that he has access to inmate activities that involve the trust fund; such as, placing telephone calls and sending and

receiving emails. Swager examined Reynolds's Trust Fund account and found that, since January 2020, Reynolds has placed 1,073 telephone calls lasting one minute or longer and has sent or received 47,001 electronic messages. ( ECF No. 274-1 at 1). Also attached are additional email communications between Reynolds and other individuals. (*Id*. at 2–29). These email exchanges discuss: placement of a disclaimer on a publication, which Reynolds directed and asked to be assembled; a publisher's note written by Reynolds concerning a publication called Urban Drip Magazine with recommended accompanying images; questions from Reynolds to his wife asking for mock-ups, live banners, publisher note, canteen funds, status of revision of a design, the cash app, the location of contents and publisher's note; whether Reynolds has pulled a book off of Amazon; images in Urban Drip Magazine; a request from Reynolds to his wife asking about "more freelancers for podcasts": information about setting up a podcast; order details; putting recordings on Reynolds's website; flier designs; advertising about Urban Drip Magazine's podcast; a book written by someone other than Reynolds and money connected to the program; analytics about work completed by Reynolds; ideas by Reynolds on promoting Urban Drip Magazine; advertisement for models for Urban Drip Magazine; invoices; selling items; directions on when to transfer Zelle funds related to a screenplay; money exchanges and mockups; directions and complaints by Reynolds on how business operations are progressing; Reynolds's request for royalty details; a release form; questions regarding a podcast and requests for notifications; changes Reynolds wants to make to flyers and directions on steps to take including updating him on the status of Google play; and questions about payments and the cash app. (*Id*. at 2–29). Finally, Defendants provide a declaration by George Yurkovich, Supervisory Correctional Systems Specialist at FCI Beckley, (ECF No. 274-2). Yurkovich explains the process used to generate rejection

notifications when mail does not meet institutional standards. Yurkovich states that the institution does not log when inmates are provided with rejection notices; however, they are given such notices as a matter of practice. He adds that FCI Beckley houses over 1000 inmates and processes hundreds of pieces of mail daily. For that reason, it is possible that on occasion rejection notices do not make it to the inmates, or can be misplaced or misfiled. Yurkovich states that during the mail pilot program, which ran from March 2020 to July 2021, advertisements were rejected because most of them were for items or services prohibited in the institution. However, upon expiration of the pilot program, advertisements were allowed. (ECF No. 274-2 at 3).

Reynolds replied to Defendants' response on July 5, 2022. (ECF No. 278). He complained that he did not receive one of the undersigned's orders and felt this was purposefully done by Defendants. He objected to Defendants providing *ex parte* explanations to the Court regarding the eleven pieces of mail that were rejected without clear explanation.[1] Reynolds argues that his claim regarding the absence of rejection notices is part of his original complaint and should not be separated out and treated as a new claim. He also points to advertisements he received during the pilot program, when advertisements were supposed to be rejected, as proof of the arbitrary nature by which FCI Beckley handles inmate mail. (*Id.*). Reynolds provided several exhibits to the Court, including the following:

1. Answers to discovery requests by Defendant Banton in which he admits that the BOP allows inmates to take steps to protect property possessed by the inmate at the time of commitment and that rejected mail was not returned to the sender during the pilot

---

[1] The explanations were later provided to Reynolds. (ECF Nos. 290, 292).

program. (ECF No. 283 at 1–2).

2. Answers to discovery requests by Defendant Wiseman in which he admitted that Reynolds complained about not receiving his mail and mail not arriving at its intended destination, and that the mailroom was delayed and backed up due to screening procedures. (ECF No. 283 at 3).

3. Answers to discovery requests by Defendant Ansley admitting that inmates can protect property and funds belonging to them at the time of commitment in limited circumstances, and that he issued an incident report to Reynolds for conducting/directing a business, which was rejected, but that a second incident report was issued to Reynolds by Austin a short time later for the same infraction. (*Id.* at 4–6).

4. Answers to discovery requests by Defendant Sweeney in which he states that BOP policy does not designate the number of books it takes to constitute "running a business." (*Id.* at 7).

5. Answers to discovery requests by Defendant Manning in which he disavows knowledge of a movie script and states that he was not questioned about complaints of seized mail. (*Id.* at 8).

6. A copy of § 540.13, which states that the Warden shall notify the sender of correspondence when it is rejected, provide a reason for the rejection, and advise that the sender may appeal the rejection. (*Id.* at 9). Likewise, the Warden shall notify an inmate of the rejection of any correspondence to the inmate, along with the reason for rejection and a notification of the right to appeal. The section also states that the Warden may not delegate the authority to reject correspondence or sign notification letters below the level of Associate Warden. (*Id.* at 9).

7. Answers to discovery requests by Defendant Young in which he admits that

15

Reynolds's mail was rejected to the extent it was deemed unauthorized business activity, and notes that there is no policy stating that writing a specific number of books constitutes "running a business." (ECF No. 283 at 10).

8. A page from a Proposed Findings and Recommendations reviewing statements made by Defendants in their motion to dismiss. (*Id.* at 11).

9. A portion of a declaration by Warden Young indicating that a notice is printed and provided to the inmate and the sender when mail addressed to the inmate is rejected. (*Id.* at 12).

10. Copies of advertisements Reynolds received during the pilot program and when advertisements were supposed to be banned. (*Id.* at 13–17).

11. A portion of a filing made by Defendants reiterating that an inmate and the sender of correspondence to the inmate are provided a notice when mail is rejected. (*Id.* at 18). Another page from the same filing indicating that the only remaining substantive issue before the court is whether officials at FCI Beckley improperly applied the mail policies to Reynolds. (*Id.* at 19).

12. A page from Policy Statement 5265.14 stating that FCI staff shall inform inmates in writing after arrival at an institution of the institution's inmate mail policies. (*Id.* at 20).

## III. <u>**Standard of Review**</u>

Summary judgment is proper under Fed. R. Civ. P. 56 when no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a disputed issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson,* 477 U.S. at 248. The party moving for summary judgment bears the initial burden of showing "an absence of evidence that demonstrates the existence of a genuine issue of fact for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

If the moving party meets its burden, then the burden shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322, n.3. The nonmoving party must do more than rely upon the allegations or the denial of allegations contained in his pleading to defeat a motion for summary judgment; instead, he must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Concrete evidence includes "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "[A] party's 'self-serving opinion ... cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.,* v. *Hog Slat, Inc.,* 954 F.3d 647, 658-59 (4th Cir. 2020) (citation omitted). The court must not resolve disputed facts, nor weigh the evidence. *Russell v. Microdyne Corp.,* 65 F.3d 1229, 1239 (4th Cir. 1995). Instead, the court must accept as true the facts asserted by the nonmoving party and review the evidence "draw[ing] all justifiable inferences" in its favor. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991).

Even still, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano,* 557 U.S. 557, 586 (2009),

(quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). Thus, while any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co*, 475 U.S. at 587, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (citation omitted). Furthermore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## IV.    **Discussion**

Although Reynolds and Defendants disagree on some facts, their disagreements are largely immaterial and do not prevent resolution of this case by summary judgment. The most significant dispute between the parties involves the issue of exhaustion. Reynolds claims that Wiseman threatened him with retaliation if he filed any additional grievances, effectively rendering the administrative remedy process unavailable to Reynolds. Wiseman denies making any threats to Reynolds and has offered evidence in support of his denial. (ECF No. 68 at 4; ECF No. 68-1 at 2; ECF No. 68-2 at 1). Normally, a factual difference such as this might preclude summary judgment. However, the summary judgment standard varies when the issue is exhaustion.

Exhaustion under the PLRA "is a question of law to be determined by the judge." *Creel v. Hudson*, No. 2:14-cv-10648, 2017 WL 4004579, at * 3 (S.D.W. Va. 2017) (quoting *Drippe v. Tobelinski*, 604 F.3d 778, 782 (3rd Cir. 2010)); *Saunders v. Kummer,* No. 2:18-cv-01514, 2021 WL 1618459, at *4 (S.D.W. Va. Apr. 26, 2021). In making that

determination "[j]udges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." *Woodhouse v. Duncan*, 741 Fed. Appx. 177, 178 (4th Cir. 2018) (citation omitted); *also* )); *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015) ("[A]ll ... of the circuits that have considered the issue agree that judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury.") (internal quotation marks omitted)). "[T]he district court may dismiss for failure to exhaust as long as the prisoner has been provided an opportunity to address the issue." *Bustillo v. Beeler,* 495 Fed. Appx. 343, 344 (4th Cir. 2012) (citing *Moore,* 517 F.3d at 725).

### A. Exhaustion

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), requires inmates to exhaust all available administrative remedies prior to filing a complaint in federal court. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). Exhaustion of administrative remedies is required when injunctive relief is requested. *Green v. Rubenstein,* 644 F. Supp.2d 723, 742 (S.D.W. Va. 2009) (citing *Goist v. U.S. Bureau of Prisons,* 2002 WL 32079467, *4, fn. 1 (D.S.C. Sep 25, 2002)). The exhaustion requirement exists to prevent waste of judicial resources by frivolous claims and provide a thorough administrative record for claims with merit. *Jones v. Bock,* 549 U.S. 199, (2007). Exhaustion encourages prisoners to use the existing system of administrative remedies, which were implemented to provide direct, efficient resolution of prisoner complaints without unnecessary involvement of the judiciary.

Exhaustion is an affirmative defense, which Defendants raise here. (ECF No. 37 at 7). The defendant has the burden of proof to show that the prisoner did not exhaust

administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). To exhaust remedies, a prisoner must follow all applicable procedural rules so prison officials have the opportunity to address his claims. The Supreme Court of the United States ('Supreme Court") has repeatedly held that courts may not read futility or other exceptions into the PLRA that are not part of its textual mandate. *Ross v. Blake,* 578 U.S. 632, 639 (2016) (holding that "[m]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion."). Nevertheless, the PLRA does contain one explicit exception to the exhaustion requirement; an inmate need not exhaust "unavailable" remedies. *Id.* at 642.

In *Ross,* the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide relief to aggrieved inmates." *Id.* Second, an administrative process is similarly unavailable when it is "so opaque" that "no ordinary prisoner can discern or navigate it." *Id* at 643-44. Finally, an inmate need not exhaust administrative remedies when prison officials thwart the inmate's access to the grievance procedure "through machination, misrepresentation, or intimidation." *Id.* at 644. "[S]uch interference with an inmate's pursuit of relief renders the administrative process unavailable." *Id.* Put simply, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725. The prisoner bears the burden of establishing that an administrative remedy was unavailable. *Graham v. Gentry,* 413 Fed. Appx. 660, 663 (4th Cir. 2011). "Once a defendant presents evidence of a failure to exhaust, the burden of

proof shifts to the inmate to show, by a preponderance of the evidence, that exhaustion occurred or that administrative remedies were unavailable." *Knutson v. Hamilton*, No. 7:20-CV-00455, 2021 WL 4163981, at *3 (W.D. Va. Sept. 13, 2021) (citations omitted).

The BOP has developed a four-step administrative process to address inmate grievances. *See* 28 C.F.R. § 542.10*, et seq*. First, the inmate is required to seek informal resolution of the issue with facility staff by filing a Request for Administrative Remedy Form BP-8. If that step proves fruitless, the inmate proceeds to the second step, which requires him to file a written Form BP-9 addressed to the warden of the facility. *Id.,* at § 542.14(a). The BP-9 must be submitted within twenty days of the occurrence on which the grievance is based. *Id.* If the warden provides an unsatisfactory response, the inmate has twenty days to appeal to the BOP's Regional Director, using Form BP-10. *Id.,* at § 542.15(a). If the Regional Director's response does not resolve the matter, the inmate must seek relief by appealing the Director's response within thirty days to the Office of General Counsel, using Form BP-11. *Id.* An unresolved grievance is not exhausted until the inmate has performed all four steps. *Gibbs v. Bureau of Prison Office,* 986 F. Supp. 941, 943 (D. Md. 1997). In addition to this four-step process, the BOP allows an inmate to file a "sensitive" administrative remedy form directly with the appropriate Regional Director. 28 C.F.R. § 542.14. Using this form, the inmate can file a remedy request without staff members at the prison being able to see the grievance.

### 1. Mail Handling Claims

The record shows that Reynolds filed a request for administrative remedy on June 2, 2020 regarding the loss of three pieces of certified mail he sent to the Beaver Post Office. (ECF No. 2 at 8). That administrative remedy was numbered 1024231-F1 and was received by FCI Beckley staff on June 4, 2020. (*Id.;* ECF No. 34-1 at 50). That

administrative remedy was informally resolved on June 15, 2020 and officially closed on June 16, 2020. (*Id.*). Therefore, that administrative remedy was exhausted.

According to the documentation, the next administrative remedy submitted by Reynolds was a "sensitive" one complaining of unprofessional and inappropriate conduct by staff, as well as mail complaints; that administrative remedy was received by the Central Office on October 23, 2020. (ECF No. 7 at 4; ECF No. 34-1 at 50). That administrative remedy was numbered 1056052-A1, and on November 9, 2020, was rejected for various reasons, including that the matters raised were not sensitive. (*Id.*). Reynolds has stated that he prepared this sensitive administrative remedy form on or about October 9, 2020, the day ***after*** his encounter with Wiseman in the mailroom, (ECF No. 12 at 6; ECF No. 13 at 1-2), and received the rejection from Central Office on November 16, 2020, twelve days ***after*** his complaint was postmarked to the Clerk of Court. (ECF No. 7 at 4; ECF No. 2 at 17). These are the only two grievances filed by Reynolds pertaining to his mail between May 2020, when he claims his manuscripts were thrown away, and October 2020, when he claims he filed a second grievance that triggered the FCI Beckley mailroom staff to harass and threaten him. (ECF No. 2 at 8; ECF No. 7 at 4; ECF No. 34-1 at 50). Thus, contrary to Reynolds's recollection, there is no evidence that he filed any grievances pertaining to his mail in the ***eighteen*** weeks prior to his encounter with Wiseman in the mailroom.

Reynolds testifies in an Affidavit that on or about Thursday, October 8, 2020 at 2:00 p.m., he was called to the mailroom at FCI Beckley. (ECF No. 13 at 1). He spoke with Defendant Banton about a grievance pertaining to an "incoming piece of mail" and gave Banton a piece of outgoing certified mail. (*Id.*). Defendant Wiseman was present, leaning against a structure. (*Id.* at 2). Wiseman proceeded to shout expletives at Reynolds,

instructing him to quit complaining about his mail and to stop writing grievances about his mail, or Wiseman would make sure Reynolds would not get his mail. (ECF No. 13 at 2) Wiseman also threatened to come to Reynolds's cell. (*Id.*). Reynolds claims that this "ad lib rule against filing any grievances was now set in no uncertain terms." (*Id.*). He adds that "the angry power-wielding officer foreclosed the administrative grievance process, at the same time, voiding the PLRA's exhaustion requirement in this case." (*Id.* at 2-3).

Defendant Wiseman submitted a Declaration in response to Reynolds's Affidavit. (ECF Nos. 68-1, 246-3). Wiseman concedes that he met with Reynolds sometime in October 2020, in the presence of another staff member, to discuss mail procedures and regulations. (*Id.* at 2). Wiseman denies threatening Reynolds, or instructing him not to file administrative remedies. (*Id.*). According to Wiseman, the administrative remedy program is administered through the Unit Team staff, and as a Correctional Systems Officer, Wiseman does not provide forms, accept or review inmate administrative remedies, or oversee the administrative remedy program at FCI Beckley. (*Id.* at 2-3).

In addition to Wiseman's Declaration, Defendants provided an OIA Investigative Report detailing the investigation performed on Reynolds's claim that Wiseman threatened him, and that Defendants Manning and Sweeney destroyed Reynolds manuscripts in May 2020. (ECF No. 246-2 at 2-6). This investigation was opened after the litigation was initiated as that was the first time the correctional facility became aware of Reynold's allegations. A Special Investigative Agent, J. Van Devender, conducted the investigation. Reynolds was interviewed by Van Devender and related his story about the lost or stolen manuscripts and the threats by Wiseman. (*Id.* at 3). Reynolds stated that he knew he was not permitted to publish under a byline or operate a business or profession

while in custody but he believed there was a law that overrode the byline regulation. (ECF No. 246-2 at 3). Other witnesses interviewed, who recalled their interactions with Reynolds much differently than described by Reynolds. (*Id.* at 4). They denied that Reynolds ever logged three manuscripts into the mail tracking logs, which would be the first step to take before sending them by certified mail. They denied destroying or losing the manuscripts and pointed out that Reynolds sent many pieces of certified mail and all of the others were logged and given tracking numbers. (*Id.*). Banton recalled speaking to Reynolds in October 2020 about a piece of certified mail and denied hearing Wiseman threaten or shout at Reynolds. (*Id.*). Wiseman likewise denied speaking unprofessionally to Reynolds. (*Id.* at 5). Both Manning and Sweeney denied knowing Reynolds personally, although they recognized his name and recalled rejecting some of his mail. (*Id.* at 5-6). They denied destroying or stealing any of his mail. Agent Van Devender examined the mail logs and noted that the tracking numbers claimed by Reynolds were not in the tracking logs, or on the USPS webpage, although many other tracking numbers associated with certified mail sent or received by Reynolds did appear in the logs. (*Id.* at 6). Agent Van Devender found insufficient evidence to support any of Reynolds's allegations. (*Id.*).

This undisputed evidence shows that Reynolds did not exhaust administrative remedies related to ***any*** lost or rejected mail or manuscripts after resolution of the first remedy pertaining to three specific pieces of lost certified mail, because he did not submit any administrative remedies. In order to exhaust the process, the inmate must initiate the process. Defendants provided the Court with a printed record of all administrative remedy forms filed by Reynolds while in BOP custody through January 8, 2021. (ECF No. 34-1 at 46-50). This document demonstrates that no forms were filed regarding any specific piece of mail or rejected manuscript after the resolved remedy in June 2020 until

October 23, 2020, and Reynolds did not wait for a response to that administrative remedy form before filing his complaint. Consequently, Defendants have carried their burden to show lack of exhaustion.

Reynolds claims that, after the first remedy was resolved, further administrative remedies were not available to him, because he was threatened by Officer Wiseman. (ECF No. 12 at 5). The burden of proof now shifts to Reynolds to prove unavailability of remedies. A prisoner who claims he failed to exhaust remedies because an official threatened or intimidated him must prove both that (1) the threat actually deterred him from lodging a grievance or otherwise following procedure, and (2) a reasonable inmate of ordinary fortitude would have been deterred by the same threats. *Lebron v. Anders,* 2021 WL 4227770 at *4 (W.D. Va., Sept. 16, 2021) (citing *Turner v. Burnside*, 541 F.3d 1077, 1085 (11th Cir. 2008)). Reynolds cannot meet this burden of proof, because his description of the encounter with Wiseman simply makes no sense. As stated, the record is clear that Reynolds submitted ***no*** administrative remedy forms between June 2, 2020—when his manuscripts were purportedly lost, stolen or destroyed by Defendants Manning and Sweeney—and October 8, 2020, when his encounter with Wiseman occurred. Wiseman was allegedly angry at Reynolds for filing so many grievances about his mail; yet, ***no*** grievances had been filed. It defies logic that Wiseman would have been shouting expletives and threatening Reynolds over a single administrative remedy that was informally resolved four months earlier and that did not implicate Wiseman in any manner. Reynolds has no witnesses to the threats, nor does he explain how Wiseman, whose job duties were apparently confined to the mailroom, would have access to Reynolds's cell or knowledge of his administrative remedy requests. Reynolds describes no prior encounters with Wiseman, no history of Wiseman physically attacking Reynolds

or other inmates, and no ongoing verbal or physical attacks by Wiseman.

Even assuming that Wiseman had made threats, Reynolds certainly has not proven that the threats actually deterred him from accessing the grievance procedure. Reynolds states in his complaint and amended complaint that he submitted the "sensitive" BP-9 form a day after Wisemen threatened him. (ECF No. 2 at 2; ECF No. 12 at 6). The fact that Reynolds submitted an administrative remedy form the following day, by itself, demonstrates that Wiseman's alleged threat did not make the remedy process unavailable to Reynolds. *Moss v. Harwood,* 19 F.4th 614, 623 (4th Cir. 2021). As the United States Court of Appeals for the Fourth Circuit ('Fourth Circuit') explained in *Moss*:

> Instead, as many of our sister circuits have held, a grievance process is rendered "unavailable" under the PLRA only if an inmate actually is prevented from using it. *See Hardy v. Shaikh*, 959 F.3d 578, 587–88 (3d Cir. 2020); *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018); *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015); *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011); *Turner v. Burnside*, 541 F.3d 1077, 1085 (11th Cir. 2008). Even where officials make threats or misleading statements that would deter a reasonable inmate from pursuing a grievance process, that is, the process remains "available" if the plaintiff himself was not deterred. *See, e.g., Rinaldi*, 904 F.3d at 268–69. That is consistent with the Supreme Court's functional approach in *Ross*, asking whether a purported grievance system is in fact "not capable of use." *See* 136 S. Ct. at 1859. If an inmate is able to access a grievance process despite official threats or "machinations," *id.* at 1860, then that process is "capable of use" by him, *id.* at 1859.

*Id.* Perhaps most telling, however, is that Reynolds mailed the complaint in this civil action to the Clerk's office twelve days ***before*** he received a response to his sensitive administrative remedy. Had Reynolds truly intended to exhaust his administrative remedies, he certainly would have waited until he received word from the Central Office before he pursued litigation. As Reynolds reveals in his complaint, he prepared the pleading and mailed it to the Clerk on November 4, 2020, because one day earlier he attempted to mail out a completed manuscript, and his mail was rejected. (*Id.* at 1-2).

Reynolds made an intentional decision at that time to disregard the BOP's administrative remedy process, not because he was threatened or because the process was "unavailable," but because he believed he was entitled to immediate injunctive relief to avoid the "irreparable harm" of not being permitted to publish his manuscripts. (*Id.* at 1-2). Therefore, the undersigned **FINDS** that Reynolds has not exhausted his administrative remedies in regard to his claims regarding mail rejected by FCI Beckley.

### 2. Due Process-Notice of Rejection Claims

After institution of the instant action, Reynolds began to repeatedly allege that FCI Beckley staff had failed to give him proper notice of rejection when some pieces of his incoming mail were refused. (ECF Nos. 166, 181, 255, 261, and 297). Defendants and Reynolds disagree on whether Reynolds was provided with notice for each rejected piece of mail, with Reynolds claiming he was not given notice and Defendants insisting that providing notice was the custom, policy, habit and practice of the correctional institution. (ECF No. 247 at 4; ECF No. 255 at 1–4). Although this claim has never been formally made part of Reynolds's complaint, (*see* ECF No. 12), the undersigned addresses the matter of exhaustion here. Defendants contend that Reynolds has not exhausted this claim. Reynolds provides no evidence that he has filed even a single administrative remedy addressing the lack of rejection notices, and the record is void of such evidence. At this point, Reynolds has received all of the rejection notices generated for the mail reviewed *in camera* by the Court; therefore, he has had ample opportunity to initiate the administrative remedy process on the notices related to that mail which he believes he did not receive in a timely fashion, or at all. To the undersigned's knowledge, Reynolds has not done so. Accordingly, the undersigned **FINDS** that Reynolds has not exhausted his administrative remedies related to his claim that FCI Beckley failed to provide him

with notice of all rejected mail, and, in any event, the claim is not properly before the Court.

### B. Injunctive Relief

Even if Reynolds had exhausted his administrative remedies in regard to mail handling by FCI Beckley, he has not met his burden for injunctive relief. It is important to point out that Reynolds does not challenge the facial constitutionality of any of the policies at issue. Instead, he claims that the policies have been applied arbitrarily and unfairly to his mail. Reynolds argues that the prison's unwarranted rejection of his mail violates the First Amendment to the United States Constitution, and he is entitled to prospective injunctive relief in the form of an order instructing FCI Beckley's Warden and mailroom staff to cease and desist their unconstitutional practices.

"[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally," *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). A plaintiff may seek injunctive relief against a federal officer in his official capacity to stop constitutional violations. *Kirby v. City of Elizabeth City, N.C.,* 388 F.3d 440, 452 n. 10 (4th Cir. 2004). However, a court should not impose an injunction imprudently, as it is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Centro Tepeyac v. Montgomery Cnty.,* 722 F.3d 184, 188 (4th Cir. 2013) (citation and internal markings omitted).

To obtain an injunction in this case, Reynolds must show: (1) that he has suffered an irreparable injury as a result of the manner in which FCI Beckley staff has handled his mail, (2) that other legal remedies are inadequate to compensate for that injury, (3) that "the balance of hardships between the plaintiff and defendant warrants a remedy", and

(4) that an injunction "would not disserve the public interest." *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) (quoting *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 156–57 (2010)). Prospective injunctive relief is designed to remedy an on-going violation of federal law. Because this type of injunctive relief is forward-looking, Reynolds must prove that there is a real and immediate threat of repeated injury if an injunction is not granted. *Simmons v. Poe,* 47 F.3d 1370, 1382 (4th Cir. 1995) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983)). Showing the existence of prior violations does not alone suffice to merit injunctive relief, because "past wrongs do not in themselves amount to that real and immediate threat of injury." *Simmons,* 47 F.3d at 1382 (quoting *Lyons,* 461 U.S. at 103). This Court is limited in its authority to issue injunctive relief in a civil action involving prison conditions. *See* 18 U.S.C. §3626(a)(1)(a). Injunctive relief can extend no further than necessary to correct a proven violation of a federal right; relief must be narrowly drawn; and it must be the least intrusive means necessary to correct the violation. *Id.* Additionally, courts have been hesitant to impose injunctions on prisons with respect to mail-handling policies, because courts are ill-equipped to handle the problems of prison administration. *See Thomas v. Wilkins*, 2015 WL 74128, at *2 (W.D. Ark., Jan. 6, 2015); *Garrison v. Davis*, 2008 WL 786667, at *2 (E.D. Mich., Mar. 21, 2008).

Prisoners and their correspondents have a limited First Amendment right to send and receive mail, protected from arbitrary government action. *See Procunier v. Martinez,* 416 U.S. 396, 413 (1974). Prison regulations concerning mail must be rationally related to a legitimate penological interest. *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989); *Turner v. Safley*, 482 U.S. 78, 89 (1987). In *Turner*, the Supreme Court established a four-factor test for determining the constitutionality of prison regulations that infringe

on First Amendment rights, including regulations for mail-handling. *Turner,* 482 U.S. 78, 89 (1987). *Turner* involved, in part, a prohibition on inmate-to-inmate mail, which the Supreme Court concluded was reasonably related to the legitimate security interests of the correctional institution. *Id.* at 91.

The Fourth Circuit has emphasized that the *Turner* test only applies after the reviewing court has determined that the policy at issue has infringed upon a prisoner's First Amendment right. *Greenhill v. Clarke*, 944 F.3d 243, 253 (4th Cir. 2019) ("[T]he correct application of the Turner test begins with the basic premise that there is a right being impinged."); *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 213 (4th Cir. 2017); *Ali v. Dixon*, 912 F.2d 86, 89 (4th Cir. 1990). If a First Amendment right is implicated, the *Turner* test then evaluates a prison policy by weighing these four factors: 1) whether there is a valid, rational connection between the prison regulation and the government's legitimate interest used to justify it; (2) whether there are alternative means for exercising the right that remain open to prison inmates; (3) the practical effects of accommodating the constitutional right on guards, other inmates, and prison resources generally; and (4) whether there are alternative regulations which could better accommodate the right with *de minimis* effect on the government interest. *Turner*, 482 U.S. at 90–91. The first factor, whether the regulation is rationally related to the government's legitimate interest, is the most important of the four, and if a regulation as applied does not satisfy the first factor, there is no need to address the other three. *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005). Conversely, "[a] district court need not explicitly articulate" its consideration of Turner factors two through four when there is only minimal evidence suggesting that the prison's regulation is irrational. *Mays v. Springborn*, 757 F.3d 643, 648 (7th Cir. 2009) (internal brackets and ellipses omitted).

Although *Turner* examined a facial challenge to prison regulations, and despite the fact that the *Turner* test seems to be crafted specifically for facial challenges, subsequent courts reviewing as-applied challenges have used the same test. *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 213–214 (4th Cir. 2017) (applying *Turner* to prison's refusal to accommodate an inmate with limited written English proficiency under policy prohibiting various communication devices); *Wardell v. Duncan*, 470 F.3d 954, 959–960 (10th Cir. 2006) (applying *Turner* to prison's rejection of books under policy banning books gifted by an unauthorized third party); *Morrison v. Hall*, 261 F.3d 896, 900–901 (9th Cir. 2001) (applying *Turner* to prison's rejection of inmate's subscribed magazine under policy prohibiting bulk rate and third and fourth class); *United States v. Stotts*, 925 F.2d 83, 85–86 (4th Cir. 1991) (applying *Turner* to prison's rejection of inmate's legal mail under policy regulating handling of special/legal mail); *Lema Kupsky v. Bonis*, 2021 WL 270926, at *5 (E.D. Wis., Jan. 27, 2021) (applying *Turner* to the prison's rejection of a book under policy limiting access to certain publications for inmates convicted of sex offenses); *Cline v. Fox*, 266 F. Supp.2d 489 (N.D.W.V. 2003) (applying *Turner* to prison's rejection of inmate's books under policy prohibiting obscene reading material). Because courts have used the *Turner* test in both facial and as-applied challenges, it is important to distinguish between these types of challenges to accurately employ the test.

In general, a prisoner mounting a facial challenge to the constitutionality of a regulation under the First Amendment must prove either that there is no set of circumstances under which the regulation would be valid or that the regulation is overbroad, such that a substantial number of its applications are unconstitutional. *Fauconier v. Clarke*, 257 F. Supp. 3d 746, 758 (W.D. Va. 2017), aff'd, 709 F. App'x 174 (4th Cir. 2018) (citing *Wash. State Grange v. Wash. State Republican Party,* 552 U.S.

442, 449 (2008)). An as-applied challenge must only prove that the regulation is unconstitutional in the instant application.  Put differently, "[t]o succeed in an as-applied constitutional challenge, [the plaintiff] must establish the policies are invalid as applied to the particular items in his case, in such a way that negates the legitimate governmental concerns." *Smith v. Roy*, No. 10-2193 (JRT/TNL), 2012 WL 1004985, at *12 (D. Minn., Jan. 25, 2012). In the context of mail handling under a *Turner* challenge, this means that the court "must conduct an independent review of the evidence to determine whether [the prison's] decision to apply the regulation and withhold [the mail] was an exaggerated response to prison concerns and therefore unconstitutional as applied." *Tory v. Davis,* No. 7:18cv00393, 2020 WL 2840163, at *3 (W.D. Va. June 1, 2020) (citing *Kaden v. Slykhuis*, 651 F.3d 966, 969 (8th Cir. 2011)). While the inmate bears the burden of disproving the validity of the regulation's application, *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003), "prison officials must still articulate their legitimate governmental interest in the regulation." *Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011). In conducting the analysis, courts are required to give deference to prison officials in the administration of correctional institutions. *Procunier,* 416 U.S. at 404-05; *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").

While it remains unclear to the undersigned how a microscopic examination of prison regulations is consistent with *Turner*'s discussion of judicial restraint and deference to prison officials, *see* 482 U.S. at 84, the existing jurisprudence occasionally requires a case-by-case review of the administration of prison mail policies. As previously

explained, in this case, between March 24, 2020 and June 30, 2021, FCI Beckley participated in a pilot program related to the processing of inmate mail. (ECF No. 219-1 at 4; ECF No. 246-1 at 1-5). During the pilot program, all inmate general correspondence was sent to an independent contractor in Florida. The independent contractor scanned the correspondence and forwarded it by email through special machines installed in the FCI Beckley mailroom, where the mail would be reviewed in PDF format by correctional facility staff for compliance with BOP and facility policies. (*Id.*). Noncompliant mail was rejected, and a rejection notice was provided to the inmate and the sender. (ECF No. 246-1 at 3). Compliant mail was printed out by mailroom staff and distributed to the inmates. (*Id.*).

After the pilot program ended, mail was once again directly processed in the FCI Beckley mailroom without use of the third party contractor. (ECF No. 274-2 at 2). During all relevant times, the handling of inmate mail at FCI Beckley was governed by applicable statutes and regulations, as well as the BOP's Program Statement No. 5265.14 "Correspondence;" Program Statement No. 5800.16 "Mail Management Manual;" FCI Beckley's Institutional Supplement No. BEC-5800.16d "Mail Management Manual;" and various in-house memoranda (ECF No. 219-1 at 35-73, ECF No. 246-1 at 9-33; ECF No. 246-1 at 35-40; ECF No. 268-1 at 7-9).

The undersigned reviewed *in camera* 65 distinct pieces of mail (67 total pieces including two duplicates) addressed to Reynolds that were rejected by FCI Beckley staff between April 18, 2020 and June 29, 2021. (ECF No. 235). Seven different reasons were given by correctional staff for the rejections; including (1) unapproved inmate-to-inmate correspondence; (2) forwarding mail from an unapproved third party; (3) advertisements; (4) greeting cards; (5) photographs; (6) publication not from a publisher;

and (7) direction of an inmate's business. Reynolds claims that, in each instance, FCI Beckley staff applied the applicable mailroom policies in an unconstitutional manner; thereby, entitling him to injunctive relief. Applying the *Turner* analysis to the reasons given for rejecting Reynolds's mail, the undersigned evaluates the propriety of injunctive relief.

### 1. Unapproved Inmate-to-inmate Correspondence

Eight pieces of mail were rejected for this reason. Title 28 U.S.C § 540.17 states: "An inmate may be permitted to correspond with an inmate confined in any other penal or corrections institution if the other inmate is either a member of the immediate family, or is a party or witness in a legal action in which both inmates are involved." (ECF No. 246-1 at 21–22). In general, depending upon the circumstances, either the unit manager or the Warden must approve the correspondence privileges between inmates. (*Id.*). Out of the eight pieces of mail, two were letters from Reynolds's mother, which were incorrectly flagged as being inmate-to-inmate correspondence. (ECF No. 235 at 1–4, 7–8). The other six were letters from Reynolds's mother, but they enclosed letters from other inmates who were not approved to correspond with Reynolds. (*Id.* at 3). The prohibition on unapproved inmate-to-inmate correspondence is intended to prevent coordination of attacks or harassment against cooperating inmates at different institutions, coordination of plans to introduce contraband, coordination of retaliation attacks against staff members at different institutions, and related threats to the safety and order of the correctional facility. (ECF No. 219-1 at 3). *Turner* upheld a similar policy restricting correspondence between inmates, with similar justification. *Turner,* 482 U.S. 78, 2263 (1987). The *Turner* court upheld that policy against a facial challenge, reasoning that a prohibition on inmate-to-inmate correspondence is rationally related to preventing

attacks and other crimes, the prohibition limits expression in correspondence only involving a limited class of people, allowing this kind of correspondence would threaten the safety of guards and other inmates, and there is no easy alternative policy. *Id.* at 2263–64. Adopting this same analysis from *Turner*, the prohibition on inmate-to-inmate correspondence was constitutional as applied to the six pieces of mail which actually contained communications from inmates at other institutions.

However, the policy was not properly applied to the two pieces of mail sent by Reynolds's mother that contained no communications from other inmates. Where the mailings at issue did not violate any existing policy, there was no rational relationship between the government's interests set forth above and the rejection of those specific pieces of mail. Defendants explained in the Supplemental Declaration of George Yurkovich that there was a period of time when the mailroom staff incorrectly believed that Cynthia Phillips was actually another inmate trying to circumvent mailroom procedures. (ECF No. 292-1 at 2). They also state that Ms. Phillips often forwarded correspondence from other inmates and helped her son direct business, and her violations were so frequent that her correspondence was categorically banned for a brief time on the ground that her mail created "a security and safety risk." (ECF No. 292-1 at 2). Defendants indicate that this ban was discontinued some time ago, although the facility still carefully scrutinizes Ms. Phillips's letters due to her multiple violations of mailroom policy in the past. (*Id.* at 2).

Based upon the undisputed evidence, the undersigned **FINDS** that the policy prohibiting inmate-to-inmate correspondence was constitutional as applied to the six pieces of mail sent by Ms. Phillips to Reynolds, which forwarded unapproved inmate correspondence. The undersigned further **FINDS** that the other two pieces of

correspondence were erroneously rejected based upon the mistaken belief that Ms. Phillips was an inmate. Where the rejection of Reynolds's mail was based on an isolated mistake or misunderstanding (such as Defendants' incorrect belief that Cynthia Phillips was an inmate), prospective injunctive relief is not appropriate. The policy was not intentionally applied in an unconstitutional manner to Reynolds; it simply should not have been applied at all. FCI Beckley quickly realized its error, because no other mail sent by Ms. Phillips was rejected on the ground that **she** was an inmate. With respect to the temporary ban on Ms. Phillips's mail, the Court need not evaluate the validity of FCI Beckley's decision, because the ban was discontinued and did not lead to other unmerited rejections during the fourteen-month time frame examined by the undersigned. As Reynolds has not shown a real and immediate threat that FCI Beckley will reject mail from Ms. Phillips on the inaccurate ground that she is an inmate, the undersigned **FINDS** that he has not met the high bar necessary to justify the imposition of an injunction.

## 2. Forwarding Third Party Mail

Three pieces of mail were rejected for being forwarded mail from an unapproved third party. (ECF No. 235 at 5, 7–8). FCI Beckley policy prohibits forwarded mail from an unauthorized third party. This policy exists to prevent inmates from using a third party to circumvent the policy prohibiting inmate-to-inmate correspondence. (ECF No. 219-1 at 5). Prohibiting the forwarding of mail has been recognized as a valid mail monitoring policy related to legitimate security interests. *Perotti v. United States*, No. 3:CV-12-1860, 2016 WL 1023367, at *4, n. 4 (M.D. Pa. Mar. 15, 2016), *aff'd,* 664 Fed. Appx 141 (3d Cir. 2016) ("Moreover, any attempt by Plaintiff's to circumvent the BOP's inmate to inmate correspondence policy by channeling mail through third parties would likewise be a proper basis for rejection of mail by prison officials."). FCI Beckley applied this policy

36

correctly to Reynolds in that all three of the letters to Reynolds that were rejected for containing forwarded mail did in fact contain forwarded mail. In two instances, Reynolds's mother sent him a letter written by an inmate at another facility seeking to have a book published. These two pieces of mail appear to be duplicates. The remaining correspondence was sent by Reynolds's mother and encloses a letter written by someone else.

Clearly, FCI Beckley has a legitimate penological interest in preventing inmates from circumventing other valid policies, including the regulation against inmate-to-inmate correspondence, and a prohibition on forwarded third party mail is rationally related to that interest—evident from the fact that some of Reynolds's mail rejected under this policy did in fact contain letters from inmates at other facilities. Inmates still retain the right to correspond directly with anyone not otherwise prohibited by facility or BOP policies; they simply cannot communicate through another party. This minimally burdens inmates and their legitimate correspondents, if at all. The mail which Reynolds's mother forwarded to him could have easily been sent directly to the prison, assuming Reynolds received the proper authorization to receive mail from the particular sender. If he lacked authorization, then mail from that particular sender should not have entered the facility in any fashion. Allowing forwarded mail would defeat the prison's policy against inmate-to-inmate mail, which is itself important to protect prison security. The prison could limit its policy to prohibit only mail which is forwarding mail from inmates; however, *Turner* does not require prisons to adopt the least restrictive means to accomplish their interests. *Turner*, 482 U.S. 78, 90 (1987). Ending the policy against forwarded mail would burden the prison more than it would benefit inmates. At a minimum, the facility and its staff would have to have some familiarity with every

individual whose mail could be enclosed in another individuals' correspondence, which would certainly double the screening burden on the mailroom staff. On balance, all four of the *Turner* factors weigh in the FCI Beckley's favor. Therefore, the undersigned **FINDS** that the policy against forwarded mail was constitutional as applied to Reynolds, and there is no basis for injunctive relief in regard to this category of mail monitoring.

### 3. Advertisements

Five pieces of mail were rejected for being advertisements. (ECF No. 235 at 3–4, 7, 9). According to the Second Supplemental Declaration of George Yurkovich, during the pilot program, the correctional staff reviewing inmate correspondence had access to a drop down menu with options for selecting the reason for rejecting a piece of mail. (ECF No. 274-2). The reasons had been selected and approved by the Warden and included the rejection of advertisements. (*Id*. at 3). Reportedly, the Warden decided to ban all advertisements during the pilot program, because the majority of advertisements received at FCI Beckley featured products or services that were prohibited in the facility. (*Id*. at 3). However, once the pilot program terminated in June 2021, the Warden decided against extending the ban, and advertisements were again permitted. (*Id*.). Reynolds disputes that Defendants banned all advertisements during the pilot program, proving his contention by supplying copies of advertisements he received between March 24, 2020 and June 30, 2021. (ECF No. 283 at 13-17). He claims that some of his advertisements were rejected simply to harass him.

The Fourth Circuit has not squarely addressed the issue of whether blanket prohibitions on bulk mail are constitutional, and there is presently a circuit split on the issue—*see Prison Legal News v. Lehman*, 397 F.3d 692, 703 (9th Cir. 2005) (holding prison's prohibition on bulk mail was unconstitutional); *Sheets v. Moore*, 97 F.3d 164,

169 (6th Cir. 1996) (holding prison's prohibition on bulk mail was constitutional). In both *Prison Legal News* and *Sheets*, the prisons argued their policy was justified by concerns that bulk mail could be used to smuggle contraband, that large quantities of mail could increase risk of a fire, and that prohibiting bulk mail allowed for more efficient cell searches. *Prison Legal News,* 397 F.3d at 699–700; *Sheets,* 97 F.3d at 168. Of note, this Court previously held that a prison policy banning all retail sales catalogues was constitutional given that the prison stated a legitimate penological interest in limiting the burden of screening the myriad of catalogues for contraband and prohibited contents. *Dixon v. Kirby,* 210 F. Supp.2d. 792, 800 (S.D.W. Va. 2002). However, here, whether there was a total ban on advertisements at FCI Beckley or not is immaterial, because there is no dispute that FCI Beckley has reverted back to it pre-existing practice of allowing advertisements in the facility. Reynolds is hard-pressed to demonstrate a "real and immediate" threat of repeated injury if injunctive relief is not granted, because the undisputed evidence is that advertisements were only supposed to be banned during the pilot program. There is nothing in the record to indicate that the procedures used during the pilot program will be reinstated at FCI Beckley, or that all advertisements will be banned in the future. Moreover, there is nothing in the record to suggest that a ban on advertisements would be inappropriate as there are legitimate penological interests for banning bulk mailings. Therefore, the undersigned **FINDS** that prospective injunctive relief is not an appropriate remedy in regard to the discontinued mailroom policy of banning advertisements.

### 4. Greeting Cards

Six pieces of mail were rejected for being greeting cards. (ECF No. 235 at 3, 6–8). FCI Beckley prohibited greeting cards, because the facility previously had experienced a

security and safety issue with narcotics and other contraband being concealed and introduced into the prison on different materials like cardstock, colored construction paper, glossy photograph paper, and other similar products. (ECF No. 219-1 at 3). Prisons have a legitimate interest in preventing the receipt of narcotics or contraband by prisoners from outsiders. Consequently, a policy that prohibits inmates from accessing greeting cards printed on such materials is rationally related to furthering the prison's interest. *See Lee v. Maryland Division of Corrections,* No. CCB-16-439, 2017 WL 713760, at *5 (D. Md. Feb. 22, 2017) (finding that Division of Corrections had clear penological objective in banning greeting cards as they were being used to smuggle Suboxone into prisons); *Leachman v. Thomas,* 229 F.3d 1148 (5th Cir. 2000) (same), *Smith v. Lumpkin,* 2020 WL 7426710 (W.D. Tex., Dec. 18, 2020) (upholding prison ban on all greeting cards); *Allen v. Wood*, 970 F. Supp. 824 (E.D. Wash. 1997) (upholding prison ban on oversized greeting cards).

According to the Declaration of Associate Warden David Rich, in 2017, prior to the pilot program, inmates were notified that greeting cards and postcards would be rejected due to safety concerns. (ECF No. 268-1 at 2, 7). During the pilot program, greeting cards—like any other piece of general correspondence—were scanned into the system by the third party contractor in Florida, sent in PDF format to the mailroom at FCI Beckley for review, and could be printed on photocopy paper supplied by the institution. However, the drop down menu listing reasons for rejecting mail apparently included greeting cards, even though original cards were not available to inmates. At the end of the pilot program, a memorandum was issued at FCI Beckley reminding inmates that original greeting cards and card stock were prohibited at the facility and would be rejected. (*Id.* at 2, 8). On March 31, 2022, the warden issued a memorandum advising inmates that the policy regarding

greeting cards had been revised. (ECF No. 268-1 at 2, 9). Greeting cards would now be copied by the facility, and the copies would be provided to the inmate. (*Id.* at 9). Inmates would still not receive the original greeting card.

In Reynolds's case, the three rejected greeting cards were received during the pilot program, as is evident from their associated reference numbers, which were only used during the pilot program. (ECF No. 219-1 at 6–7; ECF No. 235 at 3, 6–8). As stated, while the program was in place, inmates could only receive copies of their mail, not the original mail itself. (ECF No. 219-1 at 6). Given that Reynolds would have only received a copy of these greeting cards and not the original cards, and the copies were generated by correctional facility mailroom staff, there was no reasonable risk that the copies could be used to introduce narcotics or other contraband into the prison. (ECF No. 219-1 at 6). Thus, the logical relationship between banning greeting cards and FCI Beckley's legitimate interest in preventing the introduction of contraband into the facility no longer existed. In other words, while the policy banning ***original*** greeting cards was constitutional both facially and as applied, the policy was simply inapplicable during the pilot program, because original greeting cards never entered the facility, much less made their way to the inmates. The undisputed evidence is that FCI Beckley had no policy that specifically addressed how to handle copies of the greeting cards that were sent to inmates during the pilot program. Because the justification for banning greeting cards ceased to exist during the pilot program, the policy should have been put on hiatus.

However, as FCI Beckley has stopped participating in the pilot program, (ECF No. 219-1 at 5), and has since updated its policies pertaining to the handling of greeting cards, (ECF No. 268-1 at 2), the undersigned **FINDS** that there is no basis to impose injunctive relief. Even assuming that the practice of banning greeting cards during the pilot program

was unconstitutional as applied to Reynolds, he cannot demonstrate a real and imminent threat of future injury justifying the extraordinary relief of an injunction. *Porter v. Clarke*, 923 F.3d 348, 364 (4th Cir. 2019) (holding that "when a defendant discontinues illegal conduct, a party seeking injunctive relief must demonstrate that such relief is 'needed,' meaning that 'there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'") (quoting *W.T. Grant,* 345 U.S. at 633). Reynolds has not offered any evidence that FCI Beckley has plans to implement the processes of the pilot program, and if FCI Beckley decides to return to its pre-existing policy of prohibiting original greeting cards, that policy has been determined to be constitutional on multiple occasions. At this point, FCI Beckley is providing the inmates with copies of the greeting cards. Therefore, there is no on-going constitutional violation.

### 5. Photographs

Three pieces of mail were rejected for containing photographs. (ECF No. 235 at 2, 8). BOP regulations prohibit sexually explicit photographs, (ECF No. 246-1 at 18), but the only evidence of a more general ban on photographs comes from a rejection slip from FCI Beckley, dated February 28, 2020: "pictures, internet webpages, and advertisements printed on computer paper as well as any other item that could be construed as being tainted, are not permitted into the institution." (ECF No. 272-1 at 1). The rejection slip indicates that this policy was enacted in 2018, (*id.*), before the commencement of the pilot program. During the pilot program, original photographs, like everything else sent to inmates, were scanned by the third party contractor and transmitted to special machines in FCI Beckley's mailroom where they could be printed on photocopy paper supplied by the correctional facility. After the pilot program, FCI Beckley decided to photocopy

photographs and provide copies to inmates, with each inmate being allowed to receive no more than 25 loose photographs per day. (ECF No. 268-1 at 8).

Other courts have upheld partial bans on photographs. *Beard v. Banks*, 548 U.S. 521 (2006) (upholding ban on all newspapers, magazines, and photographs for inmates in the Long Term Segregation Unit); *Owen v. Wille*, 117 F.3d 1235 (11th Cir. 1997) (upholding ban on nude photographs); *Ejonga v. Sinclair*, 2020 WL 8839684, at *4 (W.D. Wash., Nov. 25, 2020), *report and recommendation adopted,* 2021 WL 963473 (W.D. Wash., Mar. 15, 2021) (upholding DOC policy limiting inmates to receiving no more than ten photographs in one mailing). Here, Defendants have not directly addressed the policy on photographs, nor have they explicitly provided a rationale for it. (*see* ECF No. 268-1). However, the ban on photographs presumably existed for the same reason as the ban on greeting cards—certain materials, including photographic paper, was previously used to smuggle substances into the prison. (ECF No. 219-1 at 3).

The prison has a legitimate interest in preventing the introduction of contraband into the facility, and preventing the receipt of original photographs is rationally related to that interest. It would be difficult for prison officials to carefully inspect and test each photograph for illicit substances. Nevertheless, during and after the end of the pilot program, inmates would have only been provided with copies of photographs and not the original photographs themselves. It seems that all of Reynolds' mail rejected for containing photographs was rejected during the pilot program. (ECF No. 235 at 2–3, 8).

Consequently, the same analysis that was made with regard to greeting cards can be made with the rejected photographs. Since Reynolds could not have received the original photographs during the pilot program, the rational relationship between banning photographs and preventing contraband from being introduced into the facility no longer

43

existed. FCI Beckley has provided no other justification for not providing copies of the photographs to Reynolds.

However, as FCI Beckley has stopped participating in the pilot program, (ECF No. 219-1 at 4), and has since updated its policies pertaining to the handling of photographs, (ECF No. 268-1 at 8), the undersigned **FINDS** that there is no basis to impose injunctive relief. Even assuming that the practice of banning copies of photographs during the pilot program was unconstitutional as applied to Reynolds, he cannot demonstrate a real and imminent threat of future injury justifying the extraordinary relief of an injunction. Reynolds has not offered any evidence that FCI Beckley has plans to implement the processes of the pilot program, and if FCI Beckley decides to return to its pre-existing policy of prohibiting **original** photographs, that policy has been determined to be constitutional by multiple courts. Moreover, as inmates are now receiving photocopies of photographs, there is no on-going constitutional violation that the Court can enjoin.

### 6. Publication not from a Publisher

One piece of mail was rejected for being a publication that was not sent by a publisher. (ECF No. 235 at 5–6). An inmate may only receive publications and newspapers from the publisher or a book club/store. 28 C.F.R. §540.71 (a)(1). Courts have upheld this policy and others like it. *Bell v. Wolfish*, 441 U.S. 520, 550 (1979); *Rogers v. Morris*, 34 Fed. Appx. 481 (7th Cir. 2002); *Georgacarakos v. Wiley*, 2010 WL 1291833, at *23 (D. Colo., March 30, 2010); *Waternman v. Commandant,* 337 F.Supp.2d 1237, 1241 (D. Kan. 2004). The prison has an interest in preventing contraband from entering the prison, and requiring that publications be sent by their publisher makes it significantly less likely that the book or magazine will contain contraband. This justification applies to Reynolds's mail, which contained a publication not sent by the

publisher or another authorized retailer. Reynolds's right to receive publications is minimally disturbed, as he can receive these same publications so long as they are from an appropriate source. There is no easy alternative policy that would equally satisfy the government's interest, since inspecting mail for illicit substances is an arduous task. Accordingly, the undersigned **FINDS** no evidence to demonstrate that FCI Beckley violated Reynolds's constitutional rights by rejecting this correspondence, and no basis for the issuance of an injunction.

### 7. Operating/Directing a Business

Most of the mail in dispute in this case was rejected in accordance with 28 C.F.R. §540.14(d)(4), which allows the warden to prohibit correspondence that includes communications directing a prisoner's business. Prisoners are prohibited from conducting a business while confined. 28 C.F.R. §541.3. Courts have repeatedly upheld this regulation. *Altizer v. Deeds*, 191 F.3d 540, 548 (4th Cir. 1999) (citing *Martinez*); *Garland v. Polley*, 594 F.2d 1220, 1221–1222 (8th Cir. 1979); *Stroud v. Swope*, 187 F.2d 850 (9th Cir. 1951) (holding inmate had no right to conduct a business while incarcerated, including his attempts to publish a book he'd written). Title 28 C.F.R. §540.14(d)(4) also states that, although a prisoner cannot direct a business while in prison, he may send or receive mailings related to a business when the correspondence is necessary to protect property or funds which legitimately belonged to the inmate at the time of his commitment into the BOP's custody. 28 C.F.R. §540.14(d)(4).

Reynolds has been operating a publishing business, Uncaged Minds, during his time in prison, and a significant portion of his mail and other communications is related to this business. (ECF No. 34-1 at 4). Reynolds is heavily involved in the management of his publication business. The various mailings discuss manuscripts of other authors,

payments, royalty statements, contracts, and advertisements for Reynolds' books. (ECF no. 235 at 3–9). Additionally, the Court takes judicial notice of the fact that Reynolds's most recent publication, completed during the course of this litigation and available via Amazon, is a how-to guide entitled, "A Convict's Guide To Banking From Prison."[2] He also started a magazine while in FCI Beckley and is arranging podcasts. Wisely, Reynolds does not dispute that he was directing a business and that the relevant mailings discussed that business; instead, he claims the mail should not have been rejected because it falls within the narrow exception for protecting previously acquired property or funds. (ECF no. 261 at 5).

Reynolds strongly believes that his mailings are allowed under the exception to protect previously acquired property or funds, but his understanding of this regulation is plainly wrong. Reynolds's current activities are not protecting previously acquired property or funds, both because the property he claims to be protecting was not in his possession until well into his period of confinement, and because his actions are not simply maintaining that property, but expanding upon it. Reynolds has not produced any evidence that his business, Uncaged Minds, or his books existed before his sentencing and incarceration in 2007. (ECF No. 34-1 at 7). In contrast, Defendants have provided evidence showing—and the online presence of the business itself verifies—that much of the business' activity is recent. For example, blog posts on the business' website, https://uncagedmindspublishing.com/2019/03, only date back to March 2019, and the earliest publication date available for any of his books is August 12, 2011. https://www.amazon.com/Donald-Reynolds (last visited Dec. 16, 2022).

---

[2] Courts may take judicial notice of websites, including online retailers, which are publicly accessible and whose accuracy is not reasonably in doubt. *See Piper v. Talbots*, 507 F. Supp.3d 339, 343 (D. Mass. 2020).

Even if Uncaged Minds existed in some form before Reynolds's date of confinement, his business activities conducted through the mail are not *protecting* the property, assets, and funds that existed prior to his incarceration in 2007. The BOP provides examples of acceptable actions to "protect" previously owned funds or property; an inmate can send correspondence about refinancing an existing mortgage, or sign insurance papers to cover existing assets. An inmate cannot, however, operate a mortgage or insurance business while confined. 28 C.F.R. §540.14(d)(4). The examples provided suggest that an inmate is limited to taking action to maintain the status quo of his personal assets, not build a business enterprise. Reynolds has been actively operating and expanding his publishing business, not merely taking steps to preserve existing assets. His correspondence involved publishing newly written manuscripts, selling those manuscripts, acquiring new authors for publication, advertising, and hiring employees. (*See* ECF no. 219, Ex. 2, 3). This correspondence is clearly prohibited by BOP and FCI Beckley policy.

Some of those mailings rejected under §540.14(d)(4) included manuscripts. Although 28 C.F.R. §551.81 and §551.82 allow a prisoner to prepare a manuscript for private use or publication and mail it as general correspondence, those rules do not override the prohibition on directing a business. Reynolds is correct in his assertions that he is allowed to write these manuscripts while in prison, (ECF No. 247 at 2), but his right to express himself through creative writing cannot be used to sidestep the prohibition on business activities. Other courts have noted that a prison's encouragement of creative activities does not create a right to engage in business. *Garland v. Polley*, 594 F.2d 1220, 1222 (8th Cir. 1979). A prisoner can draft and send manuscripts for their own personal use or for public distribution without any intent to make a profit. Had Reynolds sought to

mail out manuscripts unconnected to any business venture, he likely would have had a protected First Amendment interest in sending the manuscripts. *See Jordan v. Garvin*, 2004 WL 302361, at *4 (S.D.N.Y., Feb. 17, 2004) ("[T]he DOCS regulations prohibiting plaintiff from conducting business do not prevent plaintiff from exercising his First Amendment rights. While plaintiff may not conduct a business, he is not otherwise prevented from disseminating his work.") But once a prisoner uses those manuscripts to make a profit—once they are part of a business clearly prohibited by law—he loses any constitutionally protected interest he would have had in sending them out into the world. Reynolds's manuscripts were part of his publication business; he intended to sell the manuscripts under his publishing business, such that sending the manuscripts was an act directing his business in violation of §540.14(d)(4). FCI Beckley staff correctly rejected his attempts to send out these manuscripts.

Reynolds claims his mailings are protecting his intellectual property in the manuscripts. (ECF No. 52 at 2–3). But, again, this argument is unpersuasive for two reasons. First, he has no proof that the manuscripts were written before he entered prison in 2007. Second, *selling* a book is not necessary to preserve the author's intellectual property in the work. More importantly, running a publishing business is not required to protect intellectual property. Reynolds can copyright his writings. He can even publish them. But making a profit from a written work is not intrinsic to protecting the intellectual property, in the same way that selling a car does not protect the car from theft or destruction. Profit is not protection. All of Reynolds's business-related mailings, including the manuscripts themselves, were directing a business and were not protecting previously-acquired property.

*Turner* does not apply to this regulation, since the *Turner* factors are only to be

considered where there is a First Amendment right at stake, *Greenhill v. Clarke*, 944 F.3d 243, 253 (4th Cir. 2019), and Reynolds has no constitutional right, under the First Amendment or otherwise, to conduct a business while imprisoned. *See King v. Federal Bureau of Prisons*, 415 F.3d 634, 637 (2005); *French v. Butterworth*, 614 F.2d 23, 24 (1st Cir. 1980) (holding prisoners have no Fourteenth Amendment property or liberty right to conduct business). But, even if Reynolds had some constitutional interest in his business communications, courts have stated this prohibition would nonetheless survive scrutiny under *Turner*, as applied to similar circumstances. *Wilks v. Rose*, 2017 WL 1180751, at *7 (E.D. Wis., Mar. 26, 2017) (upholding business prohibition as applied to prisoner sending marketing materials for his published books); *Taliaferro v. Hepp*, 2013 WL 936609, at *4 (W.D. Wis., Mar. 11, 2013) (upholding business prohibition as applied to prisoner selling paintings).

FCI Beckley mailroom staff correctly followed BOP and facility policies when they rejected those pieces of Reynolds's mail which directed a business, and there was no violation of Reynolds's First Amendment rights. The undersigned **FINDS** this policy was constitutional as applied to Reynolds.

Therefore, having reviewed all of the mail handling policies applied in rejecting Reynolds's mail, the undersigned **FINDS** no grounds for injunctive relief.

## V.    <u>Proposal and Recommendations</u>

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the presiding District Judge accept and adopt the proposed findings and **RECOMMENDS** that the presiding District Judge **GRANT** Defendants' Motion for Summary Judgment, (ECF No. 246); **DENY** Plaintiff's Motion for Summary Judgment, (ECF No. 261); **DISMISS** the amended complaint, (ECF No. 12); and **REMOVE** this case from the

docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Frank. W. Volk, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Volk and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Plaintiff and counsel of record.

**FILED:** December 20, 2022

Cheryl A. Eifert
United States Magistrate Judge